ENTERED
AUG 2 1 2003
U.S. DISTRICT COURT
CLARKSBURG, WV 26301

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA

v.  Criminal No. 1:03CR39

DARYL W. SMITH,
    Defendant.

## REPORT AND RECOMMENDATION

### I.

### Introduction

Defendant was indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on July 3, 2003. The indictment charges him with: conspiracy to distribute in excess of 5 grams of cocaine base (Count 1); aiding and abetting the distribution of cocaine base within 1,000 feet of a playground (Count 13); possession with the intent to distribute cocaine base within the Northern District of West Virginia (Count 14); aiding and abetting the distribution of cocaine base within 1,000 feet of a playground (Count 20); and aiding and abetting the distribution of cocaine base within 1,000 feet of a playground (Count 29).

On August 7, 2003, in accord with the Initial Scheduling Order entered in this matter, defendant, by his counsel, filed his written motion to suppress evidence seized on the day he was arrested, July 9, 2003. He also filed a motion for a bill of particulars. Thereafter, the government responded on August 15, 2003.

On August 20, 2003, the United States by its Assistant United States Attorney John C. Parr, and the defendant, Daryl W. Smith, in person and by his counsel, Kevin Tipton, came for an

evidentiary hearing on Defendant's motions. During the hearing the Court heard the duly sworn testimony of Paul Hickman, Jill Templin, and Defendant, and also heard the argument of counsel for the government and counsel for the defendant. Before Defendant testified, the undersigned informed him of his right to remain silent, and asked if it was Defendant's voluntary decision to testify at this hearing. Defendant responded in the affirmative.

The Court having heard the evidence and argument of counsel for the parties deems the matter submitted for decision pursuant to the Court's order of reference. The undersigned resolved the Motion for Bill of Particulars by Oral Order during the hearing. Therefore the only motion remaining for consideration by the undersigned in this matter is Defendant's Motion to Suppress.

## II.

## Statement of Facts

Paul Hickman ("Hickman") is a Deputy United States Marshal. He identified the Defendant in open court. On July 9, 2003, Hickman was a member of a team of law enforcement officers looking for Defendant to arrest him pursuant to an arrest warrant issued by United States Chief District Judge Irene Keeley on July 3, 2003. Sometime in the early morning hours, the officers located Defendant at a residence on 304 Rider Avenue in Clarksburg, West Virginia. They executed the arrest warrant for Defendant at approximately 6:30 a.m. on July 9, 2003. Hickman saw Defendant through a window in the front door of the residence. He also saw two other individuals in the residence, one of whom went into a back room.

Upon entering the residence, the officers saw Defendant, who was wearing only dark-colored boxer shorts. Also present in the residence was Jill Templin, Defendant's girlfriend, who leased and lived in the residence, and two men later identified by the officers as Regis Martin and William

Mayfield, who were visiting. Ms. Templin was in the bathroom when the officers entered. The officers directed all the individuals in the residence into the living room. The officers then proceeded to perform a protective sweep of the residence.

While performing the protective sweep, one officer saw set of hand gun grips in a bathroom. The officers directed Ms. Templin into the kitchen for her own safety, as she was over eight months pregnant at the time. Hickman then found marijuana in a lidded ceramic bowl on a table in the living room. Hickman was unsure weather he had taken the lid off the bowl or if the lid had already been off the bowl. He did recall moving the table, and did see a cigarette lighter and some residue on the table near the bowl. He advised Defendant of his Constitutional rights. Defendant, referring to the marijuana, stated to Hickman, "I'll take the rap for that," or words to that effect.

After the protective sweep, the officers asked Ms. Templin for her consent to search her residence. She refused, stating she wanted to talk to her attorney, Steve Herndon. The officers attempted to contact attorney Herndon, but he was not available, having been hospitalized.

The officers waited for a United States Marshals Service van to arrive at the scene to transport Defendant. While they were waiting the other two men in the house were released. Upon arrival of the transport van, someone observed that Defendant was wearing only boxer shorts. He was handcuffed behind his back. Hickman testified he was not sure weather Defendant first asked, "Aren't you gonna let me get clothes?" or if Hickman first asked, "Do you want clothes?" Hickman testified he then asked Defendant, "Where are your pants?" Defendant then directed him to a bedroom, where he pointed out a pair of shorts on the floor. Hickman testified he then asked if there was anything in the shorts. Defendant replied "no."

Ms. Templin testified that Defendant "asked the officers if he could get clothes to put on,"

3

and that the officers then "took him to get clothes."

Defendant testified that when it was time to leave, an officer said, "Well, he needs clothing," and he (Defendant) said, "Yeah, I do need clothing." He testified he was directed to the bedroom by the officers, where Hickman picked up a pair of shorts that were on the floor, and held them up along with a baggie, and asked Defendant, "Are these yours?" And also said, "Oh, look what we found." Defendant then testified he recalled Hickman telling him earlier, that if he did not admit the marijuana was his, it would be attributed to his girlfriend. Defendant told Hickman the shorts were his.

Defendant also testified that all his clothing was in a closet in his (at that time unborn) son's room. The room was otherwise empty, having just been painted. He testified that the room in which the shorts were found was the bedroom he shared with his girlfriend, Ms. Templin. There were clothes tossed on the floor in that room.

Hickman testified he picked up the shorts and put his hands in the pockets to check for contraband before allowing Defendant to put them on. In the shorts, Hickman found two plastic baggies in each pocket, each containing a white substance, along with $550.00 in cash. He stated to Defendant, "This isn't good." Defendant remained silent. Hickman testified Defendant needed clothes because he would be appearing in court after his arrest. Hickman also testified he had no suspicion drugs would be found in the shorts. He said searching through the pants was pursuant to United States Marshal practice and policy wherein any contraband, even car keys, must be removed before clothing can be given a Defendant. Hickman also testified that he had no knowledge of whether any other officers saw the short. He himself had not had any conversation with any other officer regarding the pants. No other officer told him about any suspected contraband in the shorts.

4

After Defendant was transported from the scene by the Marshal Service van, Hickman waited at the residence with Ms. Templin and another officer for a search warrant. It is undisputed that, at some point, Ms. Templin told the officers they could search the residence. It is also undisputed that Hickman gave her a "consent to search form," and explained it to her. Hickman also told her she should not consent to a search of her residence, just because she thought they were going to get a search warrant anyway. Ms. Templin corroborated Hickman's testimony to that effect. She signed the consent to search form. Ms. Templin was advised she was not under arrest, and was free to leave. She consented to a search of her purse. She left at some point during the search, to buy some groceries. She returned about a half hour later.

Pursuant to the search, the officers found two handgun boxes, rounds of ammunition, a scale, and a plastic baggie of a white substance. The officers secured the items and filled out an inventory form which was signed by Hickman and Ms. Templin.

### III.

### Contentions of the Parties

Defendant contends with respect to his motion to suppress evidence that:

1. The warrantless search of the bowl in which the marijuana was discovered, was not performed pursuant to either the plain-view doctrine or the protective sweep doctrine.

2. No exigent circumstances existed to allow a warrantless search of the residence.

3. Ms. Templin's consent to the search of her residence was neither consensual nor voluntary.

The government contends:

1. The Government was not planning to introduce evidence of the marijuana or Defendant's

5

statement regarding the marijuana.

2. Defendant requested he be allowed to dress, advised the officers the pants were in the bedroom, and went with the officers to that bedroom, where he identified the pants as his.

3. The search of the pants themselves was a protective sweep permissible for the safety of the arresting officers.

4. Ms. Templin knowingly and voluntarily gave her written consent to search her residence.

### III.

### Discussion

The Fourth Amendment to the United States Constitution provides for "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated." The Fourth Amendment protects people, not places, and wherever an individual may harbor a reasonable expectation of privacy, he is entitled to be free from unreasonable Governmental intrusion. *Katz v. United States*, 389 U.S. 347, 351 (1967).

The Constitution does not forbid all searches and seizures. It forbids only unreasonable searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222 (1960). In order to challenge the legality of a search, a defendant must have a reasonable expectation of privacy in the place actually searched. "The warrantless search and seizure. . . would violate the Fourth Amendment only if defendant manifested a subjective expectation of privacy. . . that society accepts as objectively reasonable." *California v. Greenwood*, 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988).

"The first issue that a court must address in examining a Fourth Amendment claim is whether the defendant in question had a reasonable expectation of privacy in the area searched or the item

seized." *U.S. v. Rusher*, 966 F.2d 868 (4th Cir. 1992); *Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980); *Raykas v. Illinois*, 439 U.S. 128, 140-50, 99 S.Ct. 421, 428-34, 58 L.Ed.2d 387 (1978). In this, although in its response, the government initially stated there may be a question of Defendant's standing to object to the search, it did not argue that at the hearing, and the undersigned finds Defendant, who was residing with his girlfriend, the mother of his unborn child, at her residence, had a reasonable expectation of privacy with respect to the apartment and the pants.

The Fourth Circuit has held, and Defendant does not dispute, that, incident to his arrest, the officers could, as a precautionary matter, and without probable cause or reasonable suspicion, perform a warrantless protective sweep of the residence. *See Maryland v. Buie*, 494 U.S. 325, 110 S. Ct. 1093, (1990). The Fourth Circuit further held, however:

> We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified under the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.

*Id.* at 335, 110 S. Ct. at 1099. Here there is therefore no doubt that the warrantless search of the ceramic bowl is not justified by the protective sweep doctrine. Nor is it justified by the plain view doctrine, because Hickman testified he was not sure if the lid had been off the bowl or he had taken it off. Therefore, the undersigned finds the warrantless search of the ceramic bowl was an illegal search, and the marijuana found therein must be suppressed. Further, Defendant's statement, "I'll take the rap for that," in response to an officer's question as to ownership of the marijuana, must also be suppressed.

The undersigned points out that, as noted above, the government asserted at the hearing that

it had no intention of attempting to have the marijuana or the Defendant's statement regarding the marijuana, admitted into evidence.

Defendant contends the police conducted a warrantless search of his girlfriend's (Templin's) residence and that there were no exigent circumstances which justified such a search. Defendant's argument is without merit. The facts do not support defendant's contention that the police, while conducting a protective sweep of the residence at the outset of the arrest, examined the pants in the bedroom occupied by defendant and his girlfriend and during that examination found the contraband drugs and money and after finding the same lured defendant into the room and tricked him into identifying the pants as his. As an alternative, Defendant, by the way he testified, attempted to leave the impression with the Court that the police planted the drugs and money in his pants pocket at the same time as he was being shown the pants.

Police are permitted to make a protective sweep of a residence incident to a lawful arrest. *Maryland v. Buie*, 494 U.S. 325, 334-36, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990; *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.E.2d 290 (1978). In this case the police were aware of defendant's prior history which included charges for homicide and took precautions. Upon arrival the police observed two other person besides defendant and his girlfriend in the residence thereby justifying initial detention of those individuals and a protective sweep of the residence to insure no one else was present.

It is not disputed that defendant was found wearing only boxer shorts at the time of his arrest. Defendant's girlfriend, Jill Templin, testified she was in the kitchen and overheard the defendant ask the deputy marshal is he could have some clothes before being transported from the residence. The deputy marshal testified he was unsure whether defendant brought the subject of clothing up by

saying "you're not going to take me out of here without clothes, are you?" or whether the officer asked defendant if he wanted any clothes; that defendant led him to the bedroom where the shorts were located; he did not know where defendant's clothes were located within the residence; that he did not know there was any contraband in the shorts prior to being led to them by defendant and prior to his examining them in the presence of defendant; and that he had no knowledge that any other officer had examined the pants prior to defendant taking him to them and that no other officer had any conversation with him concerning the pants prior to defendant taking him to them.

Defendant, on the other hand testified he was led to the room by the officer; that the officer picked up the pants and held them up with the bag of drugs in his hand saying words to the effect: "Well, what do we have here? Is this yours too?" Defendant contends he admitted the pants were his because if he did not, the drugs would be held against his girlfriend. However, on cross examination and on examination by the Court, the defendant admitted the shorts were his and that he had probably worn them the day before and when he took them off, he simply let them lay on the floor because they were dirty clothes.

The undersigned concludes from the demeanor of the defendant on the witness stand and from the conflicts between defendant's testimony and that of his girlfriend when considered as a whole, that defendant's version of the events are incredible and not supported by factual evidence. There is no evidence to support any claim that the police searched the residence without a warrant and found the drugs and money in defendant's pants prior to his taking the marshal to the pants. There is no evidence the marshal or the police planted the drugs and money in defendant's pants pocket. There is credible evidence from defendant's girlfriend and the deputy marshal that defendant requested he be allowed to have some clothes before being transported. There is evidence that

defendant lived with his girlfriend in the residence and that they shared the bedroom wherein the shorts were found. There is evidence that defendant wore the shorts the day before his arrest. There is evidence defendant took the shorts off after wearing them and left them on the bedroom floor. The evidence is that defendant led the marshal to the shorts where they were left on the bedroom floor.

The exigent circumstances permitting the office to pick up the pants from the floor and to check the pockets before giving them to defendant to put on were created by the facts that defendant was about to be transported; that he was only wearing boxer shorts; that he requested he be permitted to have some clothes to put on and that a police officer is clearly justified in searching any item before giving it to a person in his custody to protect his safety and to deny the person contraband. *United States v. Ricks*, 817 F.2d 692, 696 (11th Cir. 1987); *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.E.2d 685 (1969) and *United States v. Han*, 74 F.3d 537, 541-43 (4th Cir. 1996).

Defendant's third contention is that Ms. Templin's consent to the search of the residence was not truly voluntary. A search of a container, vehicle or motel room may be made without a warrant if the individual in control of the same gives his or her consent. *United States v. Rusher*, 966 F. 2d. 868, 874 (4th Cir. 1992) and *United States v. Clarke*, 2 F.3d 81 (4th Cir. 1993). In this case there is no question that Ms. Templin was in control of the residence. She testified she had lived there for over six months, and she was the lessee. Therefore she had sufficient control to authorize the search.

It is also undisputed that Ms. Templin signed a written "consent to search" form. *See* Government Exhibit 1. The only question therefore is whether that consent was voluntarily given.

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freedly [sic] and voluntarily given" *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041 (1973). In *Schneckloth*, the United States Supreme

Court posed the precise question as: "[W]hat must the prosecution prove to demonstrate that a consent was 'voluntarily' given?" *Id.* at 223, 93 S. Ct. at 2045. The Court's answer to that question is as follows:

> We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

*Id.* at 248-249, 93 S. Ct. at 2059. Here, Ms. Templin was not in custody. Whether her consent was voluntary is therefore a question of fact to be determined from all the circumstances. Significantly, while the Supreme Court expressly did not require the subject to understand she had a right to refuse, in this matter, Ms. Templin testified she had such knowledge. Although she did not consent to the search at first, Ms. Templin did consent later, after the defendant had been transported from the residence. Although she testified she felt compelled to consent, this compulsion was based entirely on the officers' having remained in the residence for an hour or hour and a half after Defendant was transported, while waiting for a search warrant they said they were getting. She further testified that U. S. Deputy Marshal Hickman explained to her her right to refuse, and that she understood she had a right to refuse. Significantly, she testified that, after she consented to the search, but before she signed the consent to search form, Hickman had a conversation with her, telling her she should <u>not</u> consent just because she thought the officers would get a search warrant. She then signed the consent to search form.

"Voluntariness is a question of fact to be determined from all the circumstances." From the

11

circumstances and fact of this case, as presented at the hearing, the undersigned concludes the government met its burden of proof and demonstrated that Ms. Templin's consent to search was freely, knowingly, and voluntarily given, after an opportunity for reflection.

## IV.

### Recommendation

For the foregoing reasons it is recommended that Defendant, Daryl W. Smith's, Motion to Suppress the contents of the ceramic bowl and his statements regarding those contents be **GRANTED**.

It is further recommended that Defendant's Motion to Suppress the items found in the shorts be **DENIED**.

It is further recommended that Defendant's Motion to Suppress the items found pursuant to the consensual search be **DENIED**.

Any party may, within ten (10) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of these Proposed Findings

of Fact and Recommendation for Disposition to counsel of record.

Respectfully submitted this _21_ day of August, 2003.

                                        /s/ John S. Kaull
                                        JOHN S. KAULL
                                        UNITED STATES MAGISTRATE JUDGE